**Not for Publication**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| NATIXIS NORTH AMERICA LLC successor-in-interest to IXIS NORTH AMERICA, INC.,<br><br>*Plaintiff,*<br><br>v.<br><br>CAL-HARBOR V LEASING ASSOCIATES, L.L.C.,<br><br>*Defendant.* | Civil Action No. 21-cv-12800<br><br>**OPINION** |

**Evelyn Padin, U.S.D.J.**

This case involves a dispute between a landlord, Defendant Cal-Harbor V Leasing Associates L.L.C. ("Cal-Harbor"), and its former tenant, Plaintiff Natixis North America LLC ("Natixis"), over which entity is financially responsible for the removal and restoration of approximately $35,000,000 in modifications and buildouts to the office space which Natixis leased from Cal-Harbor from February 28, 2005 until July 31, 2021. Presently before the Court is Natixis's motion to dismiss all three counterclaims asserted by Cal-Harbor in its March 9, 2022 answer to Natixis's June 21, 2021 complaint. The Court has reviewed the parties' submissions and decides the motion without oral argument. *See* Fed. R. Civ. P. 78(b); L. Civ. R. 78.1(b). For the reasons stated below, Natixis's motion will be **DENIED**.

I.  BACKGROUND

A. Underlying Facts

The facts underlying this lawsuit are straightforward and largely undisputed. Natixis is a financial services firm. Cal-Harbor owns real property in Jersey City known as "Harborside" which is comprised of, *inter alia*, class A office space. On or about February 28, 2005, Cal-Harbor and Natixis executed a lease by which Natixis – through the initial lease and three subsequent amendments (the "Lease") – ultimately leased over 100,000 rentable square feet (the "Leased Space") at Harborside's Plaza V building (the "Building"). D.E. 39, p. 8, ¶ 3. The Lease expired on July 31, 2021 without Natixis renewing the same.

Natixis requires immense computing power and capabilities to manage their operations. Because of that, an enormous amount of work was required to prepare for Natixis's occupancy. Massive computer infrastructure, and the specialized climate control and electrical systems it required, had to be "built out" for Natixis's tenancy.

Natixis conditioned its leasing Building space on Cal-Harbor agreeing to: (i) perform certain initial work; and (ii) allowing Natixis to make other substantial alterations, installations, additions, and improvements in the Leased Space and elsewhere in the Building. D.E. 39, p. 8, ¶ 5. The present dispute concerns which party is financially responsible under the terms of the Lease for the removal of those substantial alternations, installations, additions, and improvements now that Natixis has vacated its tenancy at the Building. Natixis has supplied the Court with a copy of the Lease and its subsequent amendments. *See* D.E.s 43-2, 43-3, 43-4, and 43-5. There are a handful of provisions within the Lease that bear on the present motion, and the Court recites them now.

Lease Article 2 required Cal-Harbor to perform certain "Initial Work." *See* Lease § 2.02(a) ("Landlord shall perform the Initial Work (as defined in Schedule C) in accordance with the provisions of this Section 2.02, Article 46 and Schedule C attached hereto"). Article 46, in turn, delineates the parties' respective payment obligations for the Initial Work. *See* Lease at Article 46. And Lease Schedule C, states, in pertinent part, that:

> Landlord[1] agrees to have certain work performed in and to the demised premises in order to prepare same for Tenant's initial occupancy thereof (the "Initial Work") and to procure all of the required permits, licenses and other approvals required in order to commence the Initial Work (the "Work Permits"); provided, that notwithstanding anything to the contrary contained herein, the Initial Work shall not include furniture, systems furniture or equipment, trade fixtures or decorative effects (such as drapes and pictures), office equipment or computer or telecommunications installation. Landlord, at its sole cost and expense, shall install Building-standard blinds in the demised premises and minor flash patch the surfaces of the floor in the demised premises so that such floors are acceptable to receive the installation of carpeting. Landlord shall also at its sole cost and expense, construct demising walls for the portion of the demised premises on the 31st floor, but Tenant shall be responsible, at its cost, to finish the surfaces of the demising walls in the interior of the demised premises. Landlord shall install such demising wall in the area shown on the plan set forth as Schedule B annexed to this Lease . . . .

The Court emphasizes that the "Initial Work" is vaguely defined in Schedule C as "certain work performed in and to the demised premises in order to prepare same for Tenant's initial occupancy thereof." And further, that while Natixis avers that the "Initial Work" cost over $35,000,000 to complete, *see* D.E. 43-6 at 2, it has not been made clear to the Court, at this preliminary stage of litigation, how those funds were specifically spent.

---

[1] The Lease refers to Cal-Harbor as "Landlord" and Natixis as "Tenant." The Court has not altered those terms within the relevant Lease provisions detailed herein.

Section 6.03 of the Lease provides:

> All alterations, installations, additions made and installed by Landlord, including without limitation all work referred to in Article 2 hereof and in Schedule C, shall be the property of Landlord and shall remain upon and be surrendered with the demised premises as a part thereof at the end of the Term.

The plain language within Section 6.03 speaks to the Initial Work referred to in Article 2 and Schedule C, and appears to indicate that Natixis would not be responsible for the removal and restoration of the "certain work performed . . . in order to prepare same for Tenant's initial occupancy thereof." That said, it fully appears, based on Court's initial review of the plain terms of the Lease, that other substantial alternations, installations, additions and improvements beyond the "Initial Work" were performed. For example, Lease Article 45 permitted Natixis, at its own cost and expense, to: (i) install, maintain, and operate a satellite dish and support equipment on the Building's roof (defined, collectively, in the Lease as the "Installations"), *see* Lease § 45.01; and (ii) core drill and install a one inch conduit in the Building's risers to connect the Installations to a telecommunications closet that Natixis used, *see* Lease § 45.03. Section 45.04 of the Lease required Natixis, at its sole cost and expense, to repair all damage to the roof and/or Building caused by Natixis's installation, maintenance, repair, operation or removal of the Installations.

Notably, under Section 45.05:

> The Installations and related equipment installed by Tenant pursuant to the provisions of this Article 45 shall be Tenant's Property, and, upon the expiration or earlier termination of the Term of this Lease shall be removed by Tenant, at Tenant's sole cost and expense and Tenant shall repair any damage to the roof of the Building, or any other portion or portions of the Building caused by or resulting from said removal.

Further and subject to "all" of the provisions of Article 45, Cal-Harbor permitted Natixis to: (i) install, maintain and operate an emergency power system ("EPS") furnished by not more

than four 1,000 KW emergency generators on the Building's 12th floor set-back roof (Lease § 45.07); (ii) install one or two fuel storage tanks with an aggregate capacity of 7,500 gallons on the Building's first floor, a fuel pump, and fuel riser pathways (Lease § 45.07); and (iii) install on the setback roof, over the Building's 12th or 34th floor, heat rejection equipment, a platform and steel dunnage to support it, and two eight inch steel pipes between Natixis's space and the rejection system (Lease § 45.08) (all of the foregoing with the Installations, collectively, the "Article 45 Equipment"). D.E. 39, p. 9-10, ¶ 11. At the Lease's expiration, Natixis, at its sole cost and expense, was required to remove all the Article 45 Equipment and repair any damage to the Leased Space and/or the Building caused by such removal. D.E. 39, p. 10, ¶ 12; *accord* Lease § 45.05.

Other sections of the Lease also speak to the parties' obligations with respect to the removal of items from the Building and the Leased Space at the end of the Lease term.

Section 6.04 provides:

> All alterations, installations, additions and improvements made and installed by Tenant, or at Tenant's expense, upon or in the demised premises which are of a permanent nature and which cannot be removed without irreparable damage to the demised premises or the Property shall become and be the property of Landlord, and shall remain upon and be surrendered with the demised premises as a part thereof at the end of the Term, except that Landlord, at the time it approves Tenant's plans and specifications, shall have the right to require Tenant at the expiration or sooner termination of this Lease, to remove any of such alterations, installations, additions and improvements and, in such event, Tenant will, at Tenant's own cost and expense, remove the same in accordance with such request, and restore the demised premises to its original condition, ordinary wear and tear and casualty excepted; provided, that Tenant shall not be required to remove any nonstructural alteration, installation, addition or improvement which constitutes part of a customary office installation. Any internal staircase connecting more than one floor of the demised premises shall be deemed a structural alteration. Without limiting the foregoing provisions, if Landlord requires Tenant to remove such internal staircase, Tenant shall (i) seal the penetration and restore the slab where such staircase was removed so that such slab has the same structural integrity that existed prior

5

to the installation of the staircase and (ii) repair any damage caused by such removal.

Section 6.05 provides:

> Where furnished by or at the expense of Tenant, all furniture, furnishings and trade fixtures, including without limitation, murals, business machines and equipment, counters, screens, grille work, special paneled doors, cages, partitions, metal railings, free standing lighting fixtures and equipment, drinking fountains, refrigeration equipment, and any other movable property (exclusive of supplementary air conditioning equipment and raised flooring which shall become the property of Landlord) shall remain the property of Tenant which may at its option remove all or any part thereof at any time prior to the expiration of the Term. In case Tenant shall decide not to remove any part of such property, Tenant shall notify Landlord in writing not less than six (6) months prior to the expiration of the Term, specifying the items of property which it has decided not to remove. If, within thirty (30) days after the service of such notice, Landlord shall request Tenant to remove any of the said property, Tenant shall at its expense remove the same. As to such property which Landlord does not request Tenant to remove, the same shall be, if left by Tenant, deemed abandoned by Tenant and thereupon the same shall become the property of Landlord.

And Section 6.06 provides:

> If any alterations, installations, additions, improvements or other property which Tenant shall have the right to remove or be requested by Landlord to remove as provided in Sections 6.04 and 6.05 hereof (herein in this Section 6.06 called the "Tenant's Property") are not removed on or prior to the expiration of the Term, Landlord shall have the right to remove the Tenant's Property and to dispose of the same without accountability to Tenant and at the sole cost and expense of Tenant. In case of any damage to the demised premises or the Property resulting from the removal of the Tenant's Property, Tenant shall repair such damage or, in default thereof, shall reimburse Landlord for Landlord's cost in repairing such damage. This obligation shall survive any termination of this Lease. The fact that a non-material amount of Tenant's Property is left in the demised premises shall not be deemed occupancy by Tenant at the end of the Term.

Finally Section 28.01 states:

6

> Upon the expiration or other termination of the Term, Tenant shall quit and surrender to Landlord the demised premises, broom clean, in good order and condition, ordinary wear and tear and damage by fire, the elements or other casualty excepted, and Tenant shall remove all of its property as herein provided.  Tenant's obligation to observe or perform this covenant shall survive the expiration or other termination of the Term.

The factual allegations pled in support of Cal-Harbor's counterclaims are considered in the context of this contractual language.  Cal-Harbor claims that by letter, dated June 4, 2020, Natixis informed Cal-Harbor, pursuant to Paragraph 6.05 of the Lease, that at the expiration of the Lease term on July 31, 2021, Natixis intended to leave within the Leased Space and/or the Building certain moveable property, including office furniture, cabinets, shelving and storage, all appliances, mounted television sets, security system, and video conference units, IT and data-center cages, build area desk and shelving, a burner management system cabinet, computer cabinets/frames, all supplemental air conditioning units, computer room air conditioning units, dry-coolers, glycol pumps, power distribution units, electrical switch gear, uninterrupted power supplies, batteries, generators, fuel pumps, and fuel tanks.  D.E. 38, p. 11, ¶¶ 16-18.

By letter, dated June 23, 2020, Cal-Harbor formally requested that Natixis, at Natixis's expense, remove, prior to the expiration of the Lease term, the property and improvements described in its June 4, 2020 letter, and to "surrender the [Leased Space] in the condition required by the Lease, including but not limited to Article 28 thereof."  D.E. 38, p. 12, ¶ 23.

In ensuing correspondence between the parties,[2] Natixis ceased negotiating with Cal-Harbor with respect to Natixis's obligations to remove its property, alterations, installations,

---

[2]  The Court does not have copies of any of the letters exchanged by the parties leading up to this dispute.  It has therefore not reviewed Natixis's June 4, 2020 letter, Cal-Harbor's June 23, 2020 letter in response, or any of the subsequent correspondence between the parties.

additions, improvements, and Article 45 Equipment and to restore the Leased Space and parts of the Building in accordance with the terms of the Lease.  D.E. 38, p. 12, ¶ 26.

Natixis vacated the Leased Space on or before July 31, 2021 but did not: (i) remove its moveable property; (ii) remove its alterations, installations, additions, and improvements; (iii) remove the Article 45 Equipment; or (iv) restore the Leased Space to its original condition as the Lease required.  D.E. 38, p. 12, ¶ 27.

### B.  Procedural History

Natixis initiated this action on June 21, 2021, shortly before the expiration of its lease on July 31, 2021.  Natixis's complaint asserts two counts:  (1) a declaratory judgment claim requesting that the Court rule that pursuant to Sections 6.03, 6.04, and 6.05 of the Lease, Natixis has no contractual obligation to remove the items listed in Cal-Harbor's June 23, 2020 letter by the Lease's expiration date; and (2) a claim for breach of the covenant of good faith and fair dealing.  D.E. 1 ¶¶ 32-49.

On March 9, 2022, Cal-Harbor filed its pertinent pleading which, *inter alia*, asserts three formal counterclaims against Natixis: (1) a declaratory judgment claim requesting that the Court rule that (i) Cal-Harbor's Initial Work was limited to: installing blinds in the demised premises, minor floor flash patching to ready the floors for carpet installation, and the construction of demising walls; (ii) Cal-Harbor's Initial Work did not include any responsibility for Natixis's "furniture, systems furniture or equipment, trade fixtures or decorative effects (such as drapes and pictures), office equipment or computer or telecommunications installation"; (iii) under Lease § 6.05, Cal-Harbor, at its own cost, is obligated to remove its alterations, installations, additions, and improvement (other than "supplementary air conditioning and raised flooring") and restore the Leased Space and parts of the Building; and (iv) under Lease Article 45, Cal-Harbor is obligated

to remove the Article 45 Equipment and restore the Leased Space and the Building; (2) a breach of contract claim based on Natixis's purported failure to remove its alterations, installations, additions, and improvements and restore the leased property to its original condition; and (3) a second breach of contract claim seeking holdover rent from Natixis. D.E. 38 ¶¶ 30-53.

On April 29, 2022, Natixis filed the present motion to dismiss all three counterclaims pursuant to Federal Rule of Civil Procedure 12(b)(1) (as to counterclaim one) and 12(b)(6) (as to all three counterclaims). D.E. 43. Cal-Harbor filed its opposition to that motion on June 2, 2022. D.E. 46. And Natixis filed its reply on June 30, 2022. D.E. 47.

## II.     LEGAL STANDARDS

### A. Rule 12(b)(6)

"Courts use the same standard in ruling on a motion to dismiss a counterclaim under Federal Rule of Civil Procedure 12(b)(6) as they do for a motion to dismiss a complaint." *RBC Bank (USA) v. Petrozzini*, No. 12-155, 2012 WL 1965370, at *2 (D.N.J. May 31, 2012). Under this standard, the counterclaim must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. In evaluating the sufficiency of a counterclaim, the court must separate the factual and legal elements. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-211 (3d Cir. 2009). Restatements of the elements of a claim are legal conclusions, and therefore, are not entitled to a presumption of truth. *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212, 224 (3d Cir. 2011). A court will, however, accept the counterclaim's well-pleaded facts as true. *Fowler*, 578 F.3d at 210. Moreover, a district court must draw all reasonable

9

inferences from the well-pleaded facts in favor of the counterclaimant. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).

On a Rule 12(b)(6) motion to dismiss, a district court may not rely on matters extraneous to the pleading sought to be dismissed. Fed. R. Civ. P. 12(d). A motion to dismiss a counterclaim must be decided "on the face of the counterclaim." *Lukoil N. Am. LLC v. Turnersville Petroleum Inc.*, 2015 WL 5455648, at *1 (D.N.J. Sept. 16, 2015). However, in certain circumstances, a court may also consider undisputed and authentic exhibits, as well as matters of public record. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997).

### B. Rule 12(b)(1)

A motion to dismiss pursuant to Rule 12(b)(1) challenges a federal court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). An action is properly dismissed under Rule 12(b)(1) for lack of subject-matter jurisdiction "if the action does not "'arise under' the Federal Constitution, laws or treaties . . . , or is not a 'case or controversy.'" *Cospito v. Califano*, 89 F.R.D. 374, 379 (D.N.J.1981) (quoting *Baker v. Carr*, 369 U.S. 186, 198 (1961)). In contrast to a motion to dismiss for failure to state a claim under Rule 12(b)(6), where the court must accept all allegations as true, on a motion to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1), "no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977).

### C. Declaratory Judgments

The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether

or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201(a). Under the Declaratory Judgment Act, a party seeking declaratory judgment must demonstrate the existence of an actual case or controversy. 28 U.S.C. 2201(a); *Cardinal Chem. Co. v. Morton Int'l, Inc.*, 508 U.S. 83, 95 (1993). "The difference between an abstract question and a 'controversy' contemplated by the Declaratory Judgment Act is necessarily one of degree, and it would be difficult, if it would be possible, to fashion a precise test for determining in every case whether there is such a controversy." *Maryland Cas. Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273 (1941). "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." *Id.* Thus, "[w]hether there is an actual controversy within the meaning of the Act is a question which turns on the facts of each individual case." *Simmonds Aerocessories, Ltd. v. Elastic Stop Nut Corp. of Am.*, 257 F.2d 485, 489 (3d Cir. 1958).

### III. ANALYSIS

#### A. Cal-Harbor's Declaratory Judgment Counterclaim

Natixis first moves under Rule 12(b)(6) for dismissal of Cal-Harbor's declaratory judgment counterclaim, in its entirety, because it serves no "useful purpose." D.E. 43-6 at 10 (citing *Teamsters Pension Tr. Fund of Philadelphia & Vicinity v. TransWorld Port & Distribution Servs., Inc.*, No. CIV. 09-3479, 2010 WL 4269380, at *3 (D.N.J. Oct. 25, 2010). More specifically, Natixis avers that this claim must be dismissed because it "is entirely duplicative and/or redundant of: (i) Natixis' declaratory judgment claim, and (ii) [Cal-Harbor's own] Removal/Restoration Counterclaim." *Id.*

This Court has discretion to dismiss a declaratory judgment claim when issuance of the requested judgment would serve no useful purpose. *Aluminum Co. of Am. v. Beazer E., Inc.*, 124 F.3d 551, 560 (3d Cir. 1997); *Nitta Casings v. Sompo Japan Ins. Co.*, Civil Action No. 14-6850 (FLW) (DEA), 2015 WL 7195248, at *2 (D.N.J. Nov. 16, 2015). A declaratory judgment action will not serve a useful purpose if it is duplicative or redundant in light of the competing claims that have been alleged. *JJCK, LLC v. Project Lifesaver Int'l*, No. CIV. 10-930-LPS, 2011 WL 2610371, at *6 (D. Del. July 1, 2011). Thus, in the Third Circuit, a court may dismiss a defendant's counterclaim for declaratory relief "where there is a 'complete identity of factual and legal issues' between the parties' respective requests for relief." *Aldens, Inc. v. Packel*, 524 F.2d 38, 51-52 (3d Cir.1975); *Principal Life Ins. Co. v. Lawrence Rucker 2007 Ins. Trust*, 674 F. Supp. 2d 562, 566 (D. Del. 2009); *Teamsters Pension Tr. Fund of Philadelphia*, 2010 WL 426930, at *3. However, the "complete identity of factual and legal issues between the complaint and the counterclaim" must be clear. *Univ. Patents, Inc. v. Kligman*, Civ. A. Nos. 89-3525, 90-0422, 1991 WL 165071, at *1 (E.D. Pa. Aug.23, 1991) (citing *Aldens*, 524 F.2d at 51-52). Moreover, the court should "only dismiss such a counterclaim . . . when there is no doubt that it will be rendered moot by adjudication of the main action." *Penn Mut. Life Ins. Co. v. Rodney Reed 2006 Ins. Trust*, No. 09-cv-0063, 2010 WL 1993675, at *2 (D. Del. May 18, 2010) (citing *Principal Life Ins. Co.*, 674 F. Supp. 2d at 566).

The Court finds that dismissal of Cal-Harbor's declaratory judgment counterclaim in is inappropriate. While there are certainly redundancies and overlapping issues between Natixis's declaratory judgment claim and Cal-Harbor's declaratory judgment and removal/restoration breach of contract counterclaims, *i.e.*, what the scope of the Initial Work ultimately encompasses, it is unclear, at this early stage in the proceedings, that there is a *complete* identity of factual and

legal issues between those claims. Cal-Harbor, for example, points to Lease Article 45 in support of the relief it seeks via its counterclaims; Natixis's own declaratory judgment complaint makes no such reference to that provision. Indeed, Natixis, by way of its declaratory judgment claim requests only that the Court rule that pursuant to Sections 6.03, 6.04, and 6.05 of the Lease, Natixis has no contractual obligation to remove from the Leased Space and the Building the items listed in Cal-Harbor's June 23, 2020 letter (which the Court does not yet have a copy of). Cal-Harbor's declaratory judgment claim, on the other hand, asserts, *inter alia*, that Cal-Harbor's Initial Work was limited to installing blinds in the demised premises, minor floor flash patching to ready the floors for carpet installation, and the construction of demising walls, and that Cal-Harbor is obligated to remove its Article 45 Equipment and certain other alterations, installations, additions, and improvements and restore the Leased Space and parts of the Building. Cal-Harbor's removal/restoration breach of contract claim – which Natixis also moves to dismiss – seeks similar, but not identical, relief, and is thus likewise distinguishable from Natixis's declaratory judgment claim. And because there is accordingly doubt that Cal-Harbor's declaratory judgment will be rendered fully moot through the adjudication of Natixis's declaratory judgment claim and Cal-Harbor's removal/restoration breach of contract counterclaim, the Court declines, in its discretion, to dismiss Cal-Harbor's declaratory judgment claim on the basis that it serves no useful purpose.

    Natixis also alternatively moves, under Rules 12(b)(1) and 12(b)(6), to dismiss that portion of Cal-Harbor's declaratory judgment claim which seeks a declaration that Cal-Harbor's Initial Work was limited to installing blinds, minor floor flash patching, and the construction of demising walls. Natixis argues that dismissal is proper because the plain language of the "Lease makes it clear that this crabbed interpretation of the Initial Work is patently absurd." D.E. 43-6 at 14. Stated somewhat differently, Natixis avers that because this portion of Cal-Harbor's declaratory judgment

13

claim "is contradicted by the plain terms of the Lease, it fails to involve an 'actual controversy,'" it should be dismissed pursuant to Rule 12(b)(1), for lack of subject matter jurisdiction, and 12(b)(6), for failure to state a claim.

Under the Declaratory Judgment Act, a party seeking declaratory judgment must demonstrate the existence of an actual case or controversy. 28 U.S.C. 2201(a). "Whether there is an actual controversy within the meaning of the Act is a question which turns on the facts of each individual case." *Simmonds Aerocessories*, 257 F.2d at 489. In deciding a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction, a court must first determine whether the party presents a facial or factual attack because that distinction determines how the pleading is reviewed. *See Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977). "A facial attack concerns an alleged pleading deficiency whereas a factual attack concerns the actual failure of a plaintiff's claims to comport factually with the jurisdictional prerequisites." *Young v. United States*, 152 F. Supp. 3d 337, 345 (D.N.J. 2015). Here, Natixis has presented a factual attack, and thus, "the court may consider and weigh evidence outside the pleadings to determine if it has jurisdiction." *Gould Elecs. Inc. v. United States*, 220 F.3d 169, 178 (3d Cir. 2000), *holding modified by Simon v. United States*, 341 F.3d 193 (3d Cir. 2003).

After reviewing the relevant provisions of the Lease, the Court is unable to conclude what the actual scope of Cal-Harbor's Initial Work was. While it is clear that the Initial Work included installing blinds, minor floor flash patching, and the construction of demising walls, the Court cannot, based on other provisions within the Lease, conclude one way or the other that this was the only work encompassed within the Initial Work. An actual case or controversy on this issue exists, and the Court accordingly declines to dismiss this portion of Cal-Harbor's declaratory judgment claim under Rules 12(b)(1) and 12(b)(6).

### B. Cal-Harbor's Breach of Contract Counterclaims

Cal-Harbor's second and third counterclaims are breach of contract-based. Cal-Harbor's first breach of contract counterclaim (its Second Counterclaim) is based on Natixis's purported failures to remove its alterations, installations, additions, and improvements and restore the leased property to its original condition; Cal-Harbor's second breach of contract claim (Counterclaim Three) seeks holdover rent from Natixis. D.E. 38 ¶¶ 30-53. Natixis argues that both counterclaims should, for the reasons detailed *infra*, be dismissed pursuant to Rule 12(b)(6).

As to Cal-Harbor's removal/restoration claim, Cal-Harbor specifically alleges the following: (1) that in the Lease, Natixis "agreed to remove its moveable property, its alterations, installations, additions, improvements (other than "supplementary air conditioning and raised flooring"), and the Article 45 Equipment, and to restore the Leased Space and parts of the Building prior to the Lease's expiration; (2) that Natixis "breached the Lease by, among other things, vacating the Leased Space but refusing to remove its moveable property, its alterations, installations, additions, improvements (other than "supplementary air conditioning and raised flooring"), and the Article 45 Equipment, and to restore the Leased Space and parts of the Building"; and (3) that "[b]y reason thereof, [Cal-Harbor] is entitled to recover damages equal to the actual cost of removing [Natixis's] moveable property, its alterations, installations, additions, improvements, (other than "supplementary air conditioning and raised flooring") and the Article 45 Equipment, and restoring the Leased Space and Building which damages are believed to exceed $4.5 million." D.E. 38, p. 16, ¶¶ 42-44.

Natixis moves for Rule 12(b)(6) dismissal of this counterclaim based on its assertion that damages are insufficiently pled for purposes of stating a cognizable breach of contract claim. Generally speaking, to state a claim for breach of contract, a plaintiff must allege: (1) the existence

15

of a valid contract between the parties; (2) plaintiff's performance of their own obligations under that contract; (3) defective or deficient performance under the contract by a defendant; and (4) damages resulting from defendant's breach. *Goldfarb v. Solimine*, 245 N.J. 326, 338 (2021); *see also Tracey v. Recovco Mortg. Mgmt. LLC*, 451 F. Supp. 3d 337, 342 (D.N.J. 2020).

Here, Cal-Harbor has specifically pled that "damages [stemming from its removal/restoration contract claim] are believed to exceed $4.5 million." D.E. 38, p. 16, ¶ 44. Natixis avers that this is insufficient for purposes of satisfying Rule 12(b)(6)'s pleading standard because there is no indication in the pleadings – or in the subsequent developments related to this case – that Cal-Harbor "has performed any of the removal/restoration work for which it seeks 'damages.'" D.E. 43-6 at 17. This, says Natixis, renders Cal-Harbor's damages allegations speculative, uncertain, and not legally cognizable. The Court cannot agree.

As the New Jersey Supreme Court made clear over fifty years ago, "the general rule of damages for a breach of contract is subject to two qualifications . . . (1) the damages are those arising naturally according to the usual course of things from the breach of the contract, or such as may fairly and reasonably be supposed to have been in the contemplation of the parties to the contract at the time it was made, as a probable result of the breach; and (2) there must be reasonably certain and definite consequences of the breach as distinguished from the mere quantitative uncertainty." *Tessmar v. Grosner*, 23 N.J. 193, 203 (1957). Thus, "[t]he rule relating to the uncertainty of damages applies to the uncertainty as to the fact of damage and not as to its amount, and where it is certain that damage has resulted, mere uncertainty as to the amount will not preclude the right of recovery." *Id.*; *see also Trico Equip., Inc. v. Manor*, No. CIV. 08-5561 RBK/KMW, 2011 WL 705703, at *10 (D.N.J. Feb. 22, 2011) ("a considerable amount of speculation is permissible concerning the award of damages.") (citing *Tessmar*).

Here, Cal-Harbor alleges that that Natixis breached the Lease terms by refusing to remove certain installations and restore the leased property to its prior state. Assuming these facts as true, it is clear that Cal-Harbor will suffer resultant damages, *e.g.*, being the party who ultimately must bear the costs of removal and restoration, estimated by Cal-Harbor to be roughly $4.5 million dollars. Dismissal of Cal-Harbor's removal/restoration breach of contract claim on the basis that Cal-Harbor has not performed any of the removal/restoration work for which it seeks damages misses the point. Cal-Harbor's removal/restoration breach of contract counterclaim is adequately pled, and will not be dismissed at this time.

Cal-Harbor's second breach of contract counterclaim seeks hold over rent from Natixis. The parties concede that Natixis vacated the Leased Premises on or before July 31, 2021. Cal-Harbor, in effect, is alleging that because the "alterations, installations, additions, improvements, and Article 45 Equipment" that Natixis was contractually obligated to remove prior to vacating its tenancy still remain in place, Natixis is responsible for rental payments under Section 28.02, *i.e.*, the holdover tenancy provision, of the parties' Lease.

Natixis moves for Rule 12(b)(6) dismissal of this counterclaim on the basis that the foregoing, even if true, does not constitute a legally cognizable holdover tenancy under New Jersey law. The Court will deny this portion of Natixis's motion because the plain language of Section 6.06 of the Lease suggests that a holdover tenancy could be created where Natixis left a significant amount of its own property within the leased premises after July 31, 2021. *See* Lease Section 6.06 ("[t]he fact that a non-material amount of Tenant's Property is left in the demised premises shall not be deemed occupancy by Tenant at the end of the Term."). On the facts before the Court, it is conceivable, at this early stage of litigation, that the significant amount of property purportedly left by Natixis after the termination of the Lease, in and of itself, is sufficient for Cal-Harbor to

seek rent from Natixis as a holdover tenant under the plain terms of the Lease, even if this is contrary to the more limited manner in which New Jersey courts have defined holdover tenancy. *In re Comty Med. Ctr.*, 623 F.2d 864, 866 (3d Cir. 1980) ("[T]he court will not make a different or better contract than the parties themselves have see fit to enter into"); *Leisure Pass N. Am. v. Leisure Pass Grp., Ltd.*, No. 2:12-cv-03375, 2013 WL 4517841 at *9 (D.N.J. Aug. 23, 2013) (When a complex contract is negotiated by sophisticated parties and experienced counsel, "there is no reason that the Court should give either party more than it bargained for.").

## IV. CONCLUSION

For the reasons set forth above, Natixis's motion to dismiss the Counterclaims of Cal-Harbor is **DENIED**. An appropriate Order accompanies this Opinion.

Dated: October 25, 2022

/s/ Evelyn Padin  
Evelyn Padin, U.S.D.J.